UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

| | | |
|---|---|---|
| MORRIS LAMONT ROBINSON, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:03-cv-475 |
| | ) | |
| v. | ) | Honorable David W. McKeague |
| | ) | |
| KURT JONES, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner currently is on parole on sentences of ten to twenty years and sixty days, imposed by the Kent County Circuit Court on April 5, 1999, after a jury convicted Petitioner of possession of more than 50 but less than 225 grams of a mixture containing cocaine, MICH. COMP. LAWS § 333.7403(2)(a)(iii), and of maintaining a dwelling used for keeping or selling cocaine, MICH. COMP. LAWS § 333.7405(1)(d), respectively. In his *pro se* petition, Petitioner raises fourteen grounds for relief, as follows:

I.   PETITIONER WAS DEPRIVED OF HIS RIGHT UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND UNDER SECTION 14, ARTICLE 1, MICHIGAN CONSTITUTION 1963 TO DUE PROCESS WHEN THE TRIAL COURT GAVE THE JURY AN INSTRUCTION THAT INCLUDED THE ELEMENT OF INTENT TO DELIVER WHEN THE INFORMATION IN COUNT I DID NOT CHARGE THAT PETITIONER POSSESSED THE COCAINE WITH INTENT TO DELIVER.

II.   PETITIONER WAS DEPRIVED OF HIS RIGHT UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND UNDER SECTION 14, ARTICLE 1, MICHIGAN CONSTITUTION 1963

TO DUE PROCESS WHEN THE TRIAL COURT GAVE THE JURY AN
INSTRUCTION ON DURESS WHICH WRONGFULLY DEPRIVED THE
PETITIONER OF HIS ABILITY TO PRESENT A DEFENSE BECAUSE
THE INSTRUCTION COMPLETELY FORECLOSED THE JURY FROM
CONSIDERING THE DEFENSE OF DURESS.

III.   PETITIONER WAS DEPRIVED OF HIS RIGHT UNDER THE 14TH
AMENDMENT TO THE UNITED STATES CONSTITUTION AND
UNDER SECTION 14, ARTICLE 1, MICHIGAN CONSTITUTION 1963
TO DUE PROCESS WHEN HE WAS CONVICTED AND SENTENCED
FOR POSSESSION OF COCAINE WITH INTENT TO DELIVER WHEN
THE VERDICT RETURNED BY THE JURY FOUND PETITIONER
GUILTY OF POSSESSING MORE THAN 50 GRAMS OF COCAINE.

IV.    PETITIONER WAS DEPRIVED OF HIS RIGHT UNDER THE 14TH
AMENDMENT TO THE UNITED STATES CONSTITUTION AND
UNDER SECTION 14, ARTICLE 1, MICHIGAN CONSTITUTION 1963
TO DUE PROCESS WHEN THE TRIAL COURT GAVE THE JURY A
PREJUDICIAL INSTRUCTION ON THE CONSEQUENCES WHICH
WOULD FOLLOW IF THE JURY FAILED TO AGREE ON A VERDICT
ON COUNT ONE OF THE INFORMATION.

V.     PETITIONER WAS DEPRIVED OF HIS RIGHT UNDER THE 14TH
AMENDMENT TO THE UNITED STATES CONSTITUTION AND
UNDER SECTION 14, ARTICLE 1, MICHIGAN CONSTITUTION 1963
TO DUE PROCESS AND TO HIS RIGHT AGAINST SELF-
INCRIMINATION UNDER THE 5TH AMENDMENT TO THE UNITED
STATES CONSTITUTION AND UNDER SECTION 17, ARTICLE,
MICHIGAN CONSTITUTION 1963 WHEN THE PROSECUTOR ON
CROSS-EXAMINATION SOUGHT TO IMPEACH PETITIONER BY HIS
FAILURE TO INFORM THE POLICE OF HIS DEFENSE OF DURESS
AFTER HIS ARREST IN THE FACE OF THE FACT THAT PETITIONER
CLAIMED HIS RIGHT TO SILENCE AFTER THE POLICE HAD
INFORMED HIM OF HIS RIGHT TO REMAIN SILENT.

VI.    PETITIONER WAS DEPRIVED OF HIS RIGHT UNDER THE 14TH
AMENDMENT TO THE UNITED STATES CONSTITUTION AND
UNDER SECTION 14, ARTICLE 1, MICHIGAN CONSTITUTION 1963
TO DUE PROCESS WHEN THE FRUITS OF A SEARCH WARRANT
WERE ALLOWED INTO EVIDENCE WHEN THE SEARCH WARRANT
WAS ISSUED IN THE ABSENCE OF PROBABLE CAUSE; AND
PETITIONER WAS DEPRIVED OF HIS RIGHT UNDER THE 6TH
AMENDMENT TO THE UNITED STATES CONSTITUTION AND

UNDER SECTION 20, ARTICLE 1, MICHIGAN CONSTITUTION 1963 TO EFFECTIVE ASSISTANCE OF COUNSEL ON THE TRIAL LEVEL WHEN HIS TRIAL COUNSEL FAILED AND OMITTED TO CHALLENGE THE SEARCH WARRANT FOR ABSENCE OF SUPPORTING PROBABLE CAUSE BY PRE-TRIAL MOTION AND ON TRIAL.

VII.   PETITIONER WAS DEPRIVED OF HIS RIGHT UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND UNDER SECTION 14, ARTICLE 1, MICHIGAN CONSTITUTION 1963 TO DUE PROCESS WHEN THE TRIAL COURT GAVE THE JURY AN INSTRUCTION ON REASONABLE DOUBT WHICH SUBSTANTIALLY LOWERED THE BURDEN OF PROOF WHICH THE PROSECUTION HAD TO MEET IN ORDER TO JUSTIFY A VERDICT OF GUILTY.

VIII.   PETITIONER WAS DEPRIVED OF HIS RIGHT UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND UNDER SECTION 14, ARTICLE 1, MICHIGAN CONSTITUTION 1963 TO DUE PROCESS WHEN THE COURT ADMITTED EVIDENCE THAT A FINGERPRINT OF THE PETITIONER APPEARED ON A PLATE WHEN THE EVIDENCE WAS PLAIN THAT IT COULD HAVE BEEN PLACED THERE BEFORE ANY COCAINE WAS PLACED ON THE PLATE.

IX.   PETITIONER WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND UNDER SECTION 14, ARTICLE 1, MICHIGAN CONSTITUTION 1963 AND OF HIS RIGHT TO TRIAL BY JURY UNDER THE 6TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND UNDER SECTION 20, ARTICLE 1, MICHIGAN CONSTITUTION 1963 WHEN THE COURT ACCEPTED A JURY VERDICT OF GUILTY WHICH NAMED NO CRIME KNOWN TO THE LAW OF MICHIGAN AND SENTENCED DEFENDANT FOR THAT CRIME.

X.   PETITIONER WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND UNDER SECTION 14, ARTICLE 1, MICHIGAN CONSTITUTION 1963 WHEN THE TRIAL JUDGE DELIVERED TO THE JURY AN INCOMPLETE AND INADEQUATE INSTRUCTION ON THE LAW OF AIDING AND ABETTING AND WHEN THE PROSECUTOR DISCLAIMED AS HIS THEORY THAT THERE WAS A GUILTY PRINCIPAL APART FROM PETITIONER.

XI.     PETITIONER WAS DEPRIVED OF HIS RIGHT UNDER THE 6TH
AMENDMENT TO THE UNITED STATES CONSTITUTION AND
UNDER SECTION 20, ARTICLE 1, MICHIGAN CONSTITUTION 1963
TO EFFECTIVE ASSISTANCE OF COUNSEL ON THE TRIAL LEVEL
WHEN HIS TRIAL COUNSEL FAILED AND OMITTED TO OBJECT (1)
WHEN THE TRIAL COURT GAVE THE JURY AN INSTRUCTION
THAT INCLUDED THE ELEMENT OF INTENT TO DELIVER WHEN
THE INFORMATION IN COUNT I DID NOT CHARGE THAT
PETITIONER POSSESSED THE COCAINE WITH INTENT TO
DELIVER; (2) WHEN THE TRIAL COURT GAVE THE JURY AN
INSTRUCTION ON DURESS WHICH WRONGFULLY DEPRIVED THE
PETITIONER OF HIS ABILITY TO PRESENT A DEFENSE BECAUSE
THE INSTRUCTION ON DURESS WHICH WRONGFULLY DEPRIVED
THE PETITIONER OF HIS ABILITY TO PRESENT A DEFENSAE
BECAUSE THE INSTRUCTION COMPLETELY FORECLOSED THE
JURY FROM CONSIDERING THE DEFENSE OF DURESS; (3) WHEN
HE WAS CONVICTED AND SENTENCED FOR POSSESSION OF
COCAINE WITH INTENT TO DELIVER WHEN THE VERDICT
RETURNED BY THE JURY FOUND PETITIONER GUILTY OF
POSSESSING MORE THAN 50 GRAMS OF COCAINE; (4) WHEN THE
TRIAL COURT GAVE THE JURY A PREJUDICIAL INSTRUCTION ON
THE CONSEQUENCES WHICH WOULD FOLLOW IF THE JURY
FAILED TO AGREE ON A VERDICT ON COUNT I OF THE
INFORMATION; (5) WHEN THE PROSECUTOR ON HIS CROSS-
EXAMINATION SOUGHT TO IMPEACH PETITIONER BY HIS
FAILURE TO INFORM THE POLICE OF HIS DEFENSE OF DURESS
AFTER HIS ARREST IN FACE OF THE FACT THAT PETITIONER
CLAIMED HIS RIGHT TO SILENCE AFTER THE POLICE HAD
INFORMED HIM OF HIS RIGHT TO REMAIN SILENT; (6) WHEN THE
TRIAL COURT GAVE THE JURY AN INSTRUCTION ON
REASONABLE DOUBT WHICH SUBSTANTIALLY LOWERED THE
BURDEN OF PROOF WHICH THE PROSECUTION HAD TO MEET IN
ORDER TO JUSTIFY A VERDICT OF GUILTY; (7) WHEN THE TRIAL
COURT ADMITTED EVIDENCE THAT A FINGERPRINT OF THE
PETITIONER APPEARED ON A PLATE WHEN THE EVIDENCE WAS
PLAIN THAT IT COULD HAVE BEEN PLACED THERE BEFORE ANY
COCAINE WAS PLACED ON THE PLATE; (8) WHEN THE COURT
SENTENCED PETITIONER ON A VERDICT WHICH NAMED NO
CRIME KNOWN TO LAW; (9) WHEN THE TRIAL COURT GAVE AN
INSTRUCTION ON AIDING AND ABETTING A THEORY NOT
SUPPORTED BY THE EVIDENCE.

XII.    PETITIONER'S TRIAL COUNSEL FAILED TO CALL KEY WITNESSES TO VERIFY THAT THE COCAINE PETITIONER WAS CONVICTED OF POSSESSING WAS IN PLAIN VIEW APPROXIMATELY ONE HOUR AND FIFTEEN MINUTES PRIOR TO THE SEARCH WARRANT'S ARRIVAL AT 732 LAKE DRIVE, APT. #1.

XII.    DEFENSE COUNSEL FAILED TO PRESENT EVIDENCE IN HIS POSSESSION WHICH SHOWED THAT PETITIONER WAS NOT THE ONLY RESIDENT OF 732 LAKE DRIVE, APT. #1.

XIV.    DEFENSE COUNSEL FAILED TO INVESTIGATE LEADS TO CONTEST AND PROVE THE VALIDITY OF THE SEARCH AND SEIZURE.

Respondent has filed an answer to the petition (docket #9) stating that the grounds should be denied because they are either noncognizable state law claims, are procedurally defaulted, or have no merit. Upon review and applying the AEDPA standards, I find that Petitioner's claims are either procedurally defaulted or without merit  Accordingly, I recommend that the petition be denied.

## **Procedural History**

### A.  Trial Court Proceedings

The state prosecution arose from the August 14, 1998 police discovery of more than 50 grams of cocaine at the premises where Petitioner resided.  Petitioner was charged with one count of possession of more than 50 but less than 225 grams of cocaine, one count of possession with intent to distribute more than 50 but less than 225 grams of cocaine, and of maintaining a dwelling that was used for keeping or selling cocaine.  Petitioner was tried before a jury beginning February 9, 1999, and concluding on February 12, 1999.

Grand Rapids Police Officer Jose Antonio Gamez was called as the first witness by the prosecution.  (Tr. II,[1] 6.)  Officer Gamez testified that, in the early morning hours of August 14,

---

[1]Transcripts of the three days of trial proceedings are referenced as follows: February 9, 1999, "Tr. I, ___"; February 11, 1999, "Tr. II, ___"; February 12, 1999, "Tr. III, ___."

1998, he was working third shift with Officer Moreno.  The officers were dispatched to 732 Lake Drive, Grand Rapids, having received a report that a malicious destruction of property was in progress.  (Tr. II, 7.)  When they arrived, they spoke with the upstairs neighbor, who told them that three individuals were still in the apartment in question.  (Tr. II, 8, 9.)  The officers observed that the front door had been kicked in, and they observed an individual in the window, who ran away when they looked at him.  They entered the apartment and followed the person into the southwest bedroom of the house, where they arrested two suspects.  (Tr. II, 9.)  One of the suspects was wearing socks on his hands and had a stocking or panties on his head, apparently to avoid being identified, and one was carrying a .38 caliber pistol.  (Tr. II, 9, 11.)  While searching the room for the third suspect, the officers saw a plate on the dresser with residue of a substance that appeared to be cocaine, together with a razor blade, which Gamez testified is also used to cut up cocaine.  Gamez and Moreno then called vice officers to obtain a search warrant.  (Tr. II, 10.)  Gamez escorted the suspects outside, where they were detained in two separate police vehicles and charged with home invasion and carrying a concealed weapon.  (Tr. II, 13.)

Police Officer Esteban Moreno testified that, when he and Gamez arrived at the scene, they met the neighbor who had called in the complaint.  She told the officers that the individuals were still in the apartment, as she could hear them crashing around.  (Tr. II, 18.)  When he looked at the front door for the first time, he saw a black male wearing a white knit cover or hospital panties on his head.  (Tr. II, 19, 22.)  When the man bolted toward the back of the house, Moreno approached the partially open door and followed him to the master bedroom.  (Tr. II, 19-20.)  In searching the two individuals, the officers found a .32 or .38 caliber handgun and $900.  (Tr. II, 20.)  Moreno subsequently identified at trial a .32 caliber Titan-2 semi-automatic pistol.  (Tr. II, 24.)  As

the officers moved both suspects outside, the neighbor approached them and told them she believed

a third suspect, a white or light-skinned black male, was still in the house. (Tr. II, 25-26.) The

officer asked for Officer Horling of the Canine Unit, to have the dog assist in searching the premises

for the third suspect. (Tr. II, 26.) While initially searching the house to secure it, Moreno saw a

plate with fine lines of what appeared to be cocaine residue, together with a razor blade. In the next

room, the officers found an electronic scale with white powder residue and several partially used

boxes of Ziploc bags. (Tr. II, 27.) After observing these things, the officers called the Vice Unit.

(Tr. II, 27.) While doing the secondary search with the dog, the officers pulled the bed away from

the wall and found a Highpoint 9mm assault rifle. (Tr. II, 33.)

        Officer Bruce Horling, a canine officer with the Grand Rapids Police Department,

testified that in the early morning hours of August 14, 1999, he was called to bring his dog to the

address in issue to do a search for a suspect. (Tr. II, 37.) He called into the apartment that he was

a police officer with a dog. He gave persons inside the warning that if they did not come out within

one minute, he would send in the dog. No one came out, and  he and the dog found no other person

inside. (Tr. II, 37.) In conducting his search with the dog, he saw a variety of drug paraphernalia

in open view, and he saw the 9 mm assault rifle next to the bed. He drew the attention of the other

officers to the weapon. (Tr. II, 39.)

        Grand Rapids Vice Unit Police Officer Mike Rozema testified that he was called to

the scene by Officers Moreno and Gamez after they reported finding cocaine residue on a plate.

(Tr. II, 43.) He and Officer Konyenbelt obtained a search warrant for the premises based on the

observations made of the plate containing cocaine residue and the razor blade, both of which were

in plain view. (Tr. II, 44.) After conducting the search authorized by the warrant, the officers

confiscated the plate and razor blade, as well as a digital scale, boxes of sandwich baggies, certain male clothing, mail, and approximately 180 grams of cocaine and $10,000 in cash, which were found inside a humidifier.  (Tr. II, 47, 52-54, 56.)  The cocaine was located after another canine officer, Chip Ware, was called to the scene with his dog.  (Tr. II, 51.)  The dog alerted on the humidifier, which was then opened.  (Tr. II, 51.)

Grand Rapids Police Officer Charles Ware testified that he was called to the scene with his narcotics-trained dog.  His dog was let off the leash to search and almost immediately the dog signaled it had located drugs in the humidifier.  (Tr. II, 61-62.)  Ware and Officer Wu opened the humidifier and found cocaine and approximately $10,000.  The remainder of the apartment was searched and no other drugs were found.  (Tr. II, 62-63.)

Detective John Wu testified that Rozema and Konyenbelt contacted him to type up a search warrant request, referencing their observations of the items in plain view in the apartment.  (Tr. II, 66-67.)  Once the warrant was secured, Wu assisted Officer Ware in his canine search of the house.  The dog alerted to what appeared to be a broken humidifier in the bedroom.  Wu opened the humidifier and found baggies of cocaine and two bundles of cash.  (Tr. II, 67.)  During the search, Wu also secured various items of mail directed to Petitioner, as well as a gold necklace.  (Tr. II, 67-68.)

Vice Officer Mark Konyenbelt was qualified as an expert in drug activities and investigation.  (Tr. II, 80-82.)  He and Officer Rozema  responded when Officers Romeno and Gamez radioed a request for assistance based on their location of possible cocaine while investigating a breaking and entering.  (Tr. II, 83.)  After confirming that the residue found on the plates and scale was cocaine, Konyenbelt and Rozema contacted Detective Wu to write up a search

warrant. (Tr. II, 84-85.) During the search, Konyenbelt looked in the bedroom nightstand and found

mail addressed to Petitioner at 732 Lake Drive, Apartment 1. (Tr. II, 86.) He seized the items as

evidence of who lived at the residence. (Tr. II, 86.) One of the pieces of mail was a pager bill for

a pager registered to Petitioner. Konyenbelt testified that pagers frequently are used by drug dealers

to communicate with customers. (Tr. II, 90-91.) Konyenbelt testified that they also confiscated the

digital scale, which was a professional model. (Tr. II, 92.) In addition, Konyenbelt testified that he

located a buy-sell agreement indicating that Petitioner was attempting to purchase a house and had

listed his address as the Lake Drive apartment in question. (Tr. II, 92-93.) Konyenbelt reported that

the officers confiscated one pair of shoes and set of clothing from among those found in the

apartment, all of which all appeared to be for the same size individual. (Tr. II, 94-95.) The assault

rifle had previously been confiscated by the original officers at the scene. (Tr. II, 96.) That rifle

mistakenly was tagged with the police incident involving the breaking-and-entering charge and was

subsequently destroyed after the breaking-and-entering case was adjudicated. (Tr. II, 96.)

The cocaine that was confiscated from the humidifier was in three Ziploc bags, two

containing powder cocaine and the third containing crack cocaine. (Tr. II, 100.) The total amount

of cocaine was 181 grams. (Tr. II, 104.) Konyenbelt reported that the scale, the plate and the razor

blade all tested positive for cocaine. (Tr. II, 106-07.) In addition, the plate contained a latent

fingerprint. (Tr. II, 103.) Konyenbelt testified that the amount of cocaine, the organization and

denominations of the currency, and the other items found in the apartment all were consistent with

cocaine dealing rather than simple use. (Tr. II, 106, 109-10.) The amount of cocaine found would

cost a dealer approximately $6,500, but would have a street value in crack cocaine of approximately

$18,000. (Tr. II, 108.) On cross-examination, Konyenbelt acknowledged that the second person on

the real estate purchase agreement was Shanrica Nelson. (Tr. II, 114.) He testified that vice officers had no prior knowledge of 732 Lake Drive as a drug house. (Tr. II, 119.) On redirect, Konyenbelt testified that he had seen a number of vacation photographs of Petitioner while conducting his search. (Tr. II, 121.) He acknowledged on recross-examination that the photos included pictures of a number of other persons as well. (Tr. II, 122.)

Grand Rapids Police Officer William L. Wolz testified as an expert in latent fingerprint identification. (Tr. II, 125-26.) Wolz testified that latent prints are most likely to be recovered from very smooth or glassy surfaces. (Tr. II, 129.) Technicians attempted to raise prints on all surfaces of the bags, the scale and the plate. The technicians raised two prints from the plate, which Wolz was asked to identify. (Tr. II, 132-33.) The prints were identified as being from Petitioner's right ring and left index fingers. (Tr. II, 135, 136.) On cross-examination, Wolz testified that the prints came from the bottom of the plate and he acknowledged that he could not tell whether the prints were left before or after the cocaine residue was deposited on the plate. (Tr. II, 137-38.) At the end of Wolz's testimony, the prosecution rested. (Tr. II, 140; Tr. III, 3.)

The defense recalled Officer Konyenbelt to the stand. (Tr. III, 9.) Konyenbelt identified the registration of a 9 millimeter highpoint rifle to Shanrica D. Nelson at 732 Lake Drive, the same address as Petitioner's. (Tr. III, 11.) Konyenbelt also testified that during his time in the vice unit, he had become familiar with conspicuous consumption by drug dealers. (Tr. III, 16-17.) On cross-examination, Konyenbelt testified more extensively about the profitability of drug transactions, depending on the quantity sold in any transaction. (Tr. III, 41-46.)   In addition, he testified that out-of-town drug dealers frequently come into the community and pressure or bribe a resident to use their premises  for some period to conduct drug transactions. (Tr. III, 48-49.) He

- 10 -

reported that he found no pay stubs in the apartment when it was searched.  He also confirmed that drug dealers commonly get guns, cars and houses in someone else's name to protect them from seizure.  (Tr. III, 52-53.)

Petitioner took the stand in his own behalf.  He testified that on the date of the offense for which he was charged, he resided at 732 Lake Drive with his girlfriend, Shanrica Nelson.  (Tr. III, 55.)  Petitioner told the jury that police collected only those items indicating his own residency at the address and ignored items linking Nelson to the address.  Petitioner told the jury that the pictures taken by the police of the closet contents showed only the left side of a double-doored closet.  His clothes were kept on the left side and Nelson's clothes were kept on the right.  (Tr. III, 56-57.)  Petitioner testified that he owned a 1986 Volkswagen Jetta.  Police seized a copy of the bill for Petitioner's grandfather's Lexus, which Petitioner was driving.  (Tr. III, 58.)  Petitioner testified that other mail at the house was addressed to Nelson and would have been mixed in with his mail.  He identified Nelson's car payment booklet addressed to 732 Lake Drive.  (Tr. III, 59, 61-62.)  According to Petitioner, Nelson had purchased the 9 millimeter rifle for self-protection, because she was being stalked and had received phone calls.  (Tr. III, 60-61.)

Petitioner testified that he served in the Marine Corps for four years after high school.  He married in 1995 and began using cocaine late that same year, while the marriage was coming to an end.  (Tr. III, 63.)  As a result of his cocaine addiction, Petitioner became indebted to "R.J.," a Detroit drug dealer, for approximately $1,000.  (Tr. III, 63-64, 65.)  Petitioner was arrested in approximately October 1996 for possession of cocaine, and he ultimately was convicted.  (Tr. III, 64.)  After he was arrested, Petitioner stopped using cocaine.  He successfully completed his probation.  (Tr. III, 64.)  He testified he was working for Behind the Scenes Catering and was no

- 11 -

longer using drugs.  (Tr. III, 65.)  Approximately one month before the police search, R.J. approached Petitioner at a bar about Petitioner's debt.  R.J. was accompanied by two or three other men.  Petitioner was not able to pay R.J., and R.J. proposed using Petitioner's house for two months as a substitute for the debt.  (Tr. III, 65-66, 69-70, 72.)  Petitioner was threatened that if he did not pay the money or allow R.J. to use the apartment, R.J. would "take it out on [his] person."  (Tr. III, 106.)  Petitioner understood that if he did not agree to the arrangement, he would be "[s]everely injured or killed."  (Tr. III, 113.)  Petitioner suspected that the apartment would be used to store drugs.  (Tr. III, 70.)  Petitioner gave R.J. the key and told him, whatever he did with the apartment, to avoid doing it when either Petitioner or his girlfriend were there.  (Tr. III, 72.)  Petitioner testified that he saw the police at his home on the night of the search.  Because he did not want to be part of R.J.'s problem with the police, Petitioner went to a motel.  (Tr. III, 72-73.)  Petitioner testified that he never handled anything in his home having to do with drugs, whether it was baggies, a scale or a plate with cocaine residue.  He may have handled the plate, but not when it had residue.  (Tr. III, 74-76.)  He was afraid to look for drugs or money in his house or to touch them.  (Tr. III, 81-82.) Petitioner testified that, while R.J. dressed expensively (Tr. III, 67-68), Petitioner owned no jewelry and drove a 1986 Volkswagen Jetta.  His girlfriend owned no expensive jewelry or clothes and drove a 1992 vehicle.  (Tr. III, 77-78.)  After retaining an attorney, Petitioner turned himself in to the police.  (Tr. III, 73, 84.)  Petitioner acknowledged on cross-examination that he had received a letter from his cousin, in which his cousin responded to Petitioner's question about whether he was wrong for buying the Lexus.  His cousin told him that he was cutting it too close and that his cousin was worried about Petitioner.  The prosecution suggested the language referred to Petitioner being involved in drugs, though Petitioner denied that was his cousin's meaning.  (Tr. III, 109-10.)  In

response to the prosecutor's question, Petitioner testified that he did not tell the police what had happened because he feared he would not be believed.  (Tr. III, 110.)  The prosecutor renewed his question:

> Q.   And you never do tell them the story until you get on the stand here today, right?
>
> A.   Correct.
>
> Q.   Before we walked in here today, you never told any police officer this version of events, isn't that correct?
>
> A.   They never asked.
>
> Q.   I'm sorry?
>
> A.   They never asked.
>
> Q.   They never asked?
>
> A.   No.

(Tr. III, 110-11.)  At this point, a bench conference was held, after which the prosecutor continued to inquire about Petitioner's silence.

> Q.   Mr. Robinson, your story is that the reason you never told Detective Mesman, or Detective Konyenbelt, or any of the police officers here is because they never asked.  Is that your story?
>
> A.   Yes.  This is my first time seein' them, since I've been in Court.
>
> Q.   You saw them at the preliminary examination.  Let me ask you this, Mr. Robinson.  Isn't it true that the reason these officers never asked you your version of the events here, your version of why this cocaine's in your apartment, why all the tangible circumstantial evidence ties you to this place, which you've admitted to is yours, that these drugs are in your humidifier, that this $10,000 is in your humidifier, that there's a cocaine residue plate with your fingerprint on it, the reason they never asked you is because you invoked your right to remain silent.  Is that the truth, sir?

- 13 -

A.      Remain silent?

Q.      Means you didn't want to talk to them  You had an opportunity, but you
        invoked, which you had the right to do, and which I could not comment on
        until you opened the door on this issue, you never gave them that opportunity
        to ask your version.  Isn't that true?

A.      And, like I said before –

Q.      Is it true, sir.  Yes or no.

A.      Yes.

(Tr. III, 111-12.)  On redirect, Petitioner testified that he had remained silent on the advice of

counsel.  (Tr. III, 112.)  The defense rested and the prosecution had no rebuttal witnesses.  (Tr. III,

113.)

        At the conclusion of trial, on February 12, 1999, the jury found Petitioner guilty of

possession of more than 50 grams of cocaine and of maintaining a drug house.  (Tr. III, 189-90.)  On

March 29, 1999, Petitioner was sentenced to serve a term of 10 to 20 years on the possession offense

and 60 days on the drug house offense.  (Kent Co. Docket Sheet, docket #13.)

### B.  Direct Appeal

        Petitioner appealed as of right to the Michigan Court of Appeals.  During pendency

of his appeal, On October 29, 2004, Petitioner filed a motion for new trial and for an evidentiary

hearing on the ineffective assistance of counsel.  (Kent Co. Docket Sheet, docket #13.)  The motion

was denied on December 30, 1999.  (12/30/99 Tr. Ct. Ord., docket #17.)  Petitioner's appellate brief

was filed by counsel on November 24, 1999, raising the first eleven issues as raised in this

application for habeas corpus relief.  (See Def.-Appellant's Br. on Appeal, docket #17.)  By

unpublished opinion issued on October 24, 2000, the Michigan Court of Appeals rejected all

- 14 -

appellate arguments and affirmed Petitioner's convictions and sentences.  (See 10/24/00 Mich. Ct. App. Opinion ("MCOA Op."), docket #17.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same eleven claims raised before and rejected by the Michigan Court of Appeals.  By order entered April 30, 2001, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See Mich. Ord., docket #19.)

### C.  Post-conviction relief

On January 24, 2002, Petitioner filed a motion for relief from judgment in the Kent County Circuit Court, raising the last three claims raised in his habeas petition.  (Kent Co. Docket Sheet, docket #13.)  The circuit court denied the motion on January 31, 2002, on the basis of MICH. CT. R. 6.508(D).  (Kent Co. Docket Sheet, docket #13.)  Petitioner filed a delayed application for leave to appeal to the Michigan Court of Appeals, which was denied on August 15, 2002, on the grounds that Petitioner had failed to meet the burden establishing entitlement to relief under MICH. CT. R. 6.508(D).  (8/15/02 Mich. Ct. App. Ord., docket #18.)  Petitioner sought leave to appeal to the Michigan Supreme Court, which also denied leave on the grounds of MICH. CT. R. 6.508(D).

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA").  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing

*Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.), *cert. denied*, 124 S. Ct. 535 (2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.     Grounds 1, 2, 4, 7 & 10:  Instructional Errors

In various grounds of his petition, Petitioner has asserted that he was denied his right due process on the basis of instructional errors. In Ground I, Petitioner asserts that the trial court failed to instruct the jury on the element of intent required to prove possession of more than 50 grams of cocaine with intent to deliver. In Ground II, Petitioner contends that the court improperly instructed the jury on the defense of duress completely deprived Petitioner of his ability to present

a defense.  In Ground IV, Petitioner argues that the trial court's supplemental instruction to the jury about the consequences of its failure to agree was prejudicial.  In Ground VII, Petitioner claims that the court's instruction on reasonable doubt improperly lowered the burden of proof.  Finally, in Ground X, Petitioner asserts that the court's instruction on aiding and abetting was improper in light of the prosecutor's theory of the case.[2]

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), "it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process."  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same).  If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law.  *Id.*

---

[2]I note that Petitioner has not provided any detail in his petition regarding his asserted grounds for relief. Instead, he merely has listed the titles of his claims.  Because the language of the claim headings is identical to those presented in the state courts, I hereafter refer to the specifics of Petitioner's claims based upon the arguments raised in the state-court briefs.

## A.   Ground I:  Instruction on Intent

In his first ground for habeas relief, Petitioner asserts that the trial court improperly failed to instruct the jury concerning the element of intent in the charged offense of possession with intent to deliver in excess of 50 grams of cocaine.  In its answer, Respondent asserts that the claim is procedurally defaulted because Petitioner did not raise a contemporaneous objection at trial and the court of appeals concluded that the claim was not raised.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice."  *Hicks*, 377 F.3d at 551-52; *see Murray v. Carrier*, 477 U.S. 478, 495 (1986)) (specifying that a 'fundamental miscarriage of justice' will result

"where a constitutional violation has probably resulted in the conviction of one who was actually innocent.").

The state court held that Petitioner had waived his claim by failing to object at the time jury instructions were given. It is clear that the contemporaneous objection rule regarding jury instructions was well-established at the time of Petitioner's trial in 1999. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985); *People v. Curry*, 437 N.W.2d 310, 314 (Mich. Ct. App. 1989); *People v. Kendrick*, 195 N.W.2d 896 (Mich. Ct. App. 1972). This contemporaneous objection rule serves an important State interest in ensuring that counsel do their part in preventing trial courts from providing juries with erroneous instructions. *See Osborne v. Ohio*, 495 U.S. 103, 123 (1990) (holding that failure to urge the trial court to instruct was an adequate state law ground to prevent reaching the federal claim).

However, the U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the Petitioner on the merits. *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."). Where, as here, the procedural default issue raises more questions than does the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

Petitioner has not and cannot demonstrate that the jury instruction denied him due process. First, review of the trial transcript indicates that the trial court squarely addressed the intent

required to prove Petitioner guilty of possession with intent to distribute more than 50 grams of

cocaine:

> And the final thing which needs to be established by the evidence is that Mr.
> Robinson intended for some of the mixture to be distributed to others, not that he
> necessarily intended to distribute it himself, but that he intended that it be distributed
> by him or by others to someone else. . . .

(Tr. III, 163.)  The court provided further instructions on the manner in which such intent could be

proved.  The jury clearly and properly was informed of the necessary element of intent with respect

to the charge.

Moreover, as the Michigan Court of Appeals noted, Petitioner cannot demonstrate

any harm:

> Under the circumstances, it is not necessary to determine whether the charge
> was inappropriately submitted to the jury because, even if there was error, it was
> rendered harmless when the jury acquitted defendant of the unwarranted charge.
> *People v Graves*, 458 Mich 476; 581 NW2d 229 (1998).  Because any error was
> cured, defendant cannot demonstrate that he was prejudiced.  Therefore, reversal is
> not warranted.

(MCOA op. at 2.)  Because Petitioner was not convicted of possession with intent to distribute, any

error in the court's instruction regarding the elements of that offense is harmless.  For both reasons,

Petitioner has failed to demonstrate that the state court's decision was either contrary to or an

unreasonable application of clearly established Supreme Court precedent.  28 U.S.C. § 2254(d).  I

therefore recommend that his first ground for habeas relief be denied.

### B.        Ground II:  Duress

At trial, Petitioner raised the defense of duress, arguing that he permitted R.J. to use

his apartment because he was afraid he would be seriously injured or killed if he refused.  The trial

court determined that Petitioner had failed to offer sufficient evidence to support an instruction on

duress.  In ground two of his habeas application, Petitioner asserts that denial of the instruction violated his right to present a defense.

As previously noted, it is not the province of a federal habeas court to re-examine state-law determinations on state-law questions.  *Estelle*, 502 U.S. at 68.  As a result, the state court's determination about the requirements for the defense of duress is not subject to habeas review in this court unless such requirements conflict with a constitutionally based defense established by the Supreme Court.  Petitioner has not cited such a constitutional entitlement to have the jury instructed on the defense of duress solely on the basis of Petitioner's claim that he was subjected to coercion, even coercion implicating personal risks.  Indeed, in *United States v. Bailey*, 444 U.S. 394, 415 (1980), the Supreme Court recognized that, in the context of the federal common law defense of duress,

> precisely because a defendant is entitled to have the credibility of his testimony, or that of witnesses called on his behalf, judged by the jury, it is essential that the testimony given or proffered meet a minimum standard as to each element of the defense so that, if a jury finds it to be true, it would support an affirmative defense – here that of duress or necessity.

*Id.*

The Michigan Court of Appeals applied established Michigan law governing the requirements of the defense of duress in Michigan:

> In *People v. Lemons*, 454 Mich 234, 245-47; 562 NW2d 447 (1997), the Court stated:
>
> > "Duress is a common-law affirmative defense.  It is applicable in situations where the crime committed avoids a greater harm.  The reasons underlying its existence are easy to discern:
> >
> > > 'The rationale of the defense of duress is that, for reasons of social policy, it is better that the defendant, faced with a choice of

- 22 -

evils, choose to do the lesser evil (violate the criminal law) in order to avoid the greater evil threatened by the other person.'

In order to properly raise the defense, the defendant has the burden of producing 'some evidence from which the jury can conclude that the essential elements of duress are present.' In *People v Luther*, 394 Mich 619, 623; 232 NW2d 184 (1975), we held that a defendant successfully carries the burden of production where the defendant introduces some evidence from which the jury could conclude the following:

'A)  The threatening conduct was sufficient to create in the mind of a reasonable person the fear of death or serious bodily harm;

B)  The conduct in fact caused such fear of death or serious bodily harm in the mind of the defendant;

C)  The fear or duress was operating upon the mind of the defendant at the time of the alleged act; and

D)  The defendant committed the act to avoid the threatened harm.'

Additionally, in *People v Merhige*, 212 Mich 601, 610-11; 180 NW 418 (1920), we acknowledged that the threatening conduct or act of compulsion must be "present, imminent, and impending, that [a] threat of future injury is not enough," and that the threat "must have arisen without the negligence or fault of the person who insists upon it as a defense.  [Citation omitted.]

(MCOA op. at 2-3.)  The trial court concluded and the court of appeals affirmed that Petitioner had failed to introduce facts supporting the prima facie case because he failed to testify to any "particular and specific threat."  (MCOA op at 4.)  He further completely failed to present evidence that any danger was imminent.  (MCOA op. at 3-4.)  In addition, the trial court, relying on *Lemons*, 562 N.W.2d 447, concluded that Petitioner could not demonstrate that he was entitled to relief because he had created any dangerous situation by his own illegal conduct in using drugs and incurring a debt

- 23 -

to a drug dealer. (Tr. III, 178-79.) The Michigan Court of Appeals did not address this additional argument in its decision.

The state courts' findings concerning the applicability of the defense of duress clearly were reasonable determinations of the facts in light of established state law, and Petitioner has failed to demonstrate any constitutional deprivation. The state court's refusal to allow the instruction on the defense of duress does not demonstrate the sort of fundamental unfairness that would deny due process. *See Estelle*, 502 U.S. at 75. Petitioner therefore is not entitled to habeas relief on his second habeas ground.

### C.    Ground IV: Supplemental Instruction

In ground four, Petitioner asserts that the court gave a prejudicial supplemental instruction in response to a jury question about the implications of the jury's failure to reach agreement on one of the counts. Petitioner argues that the trial court improperly informed the jury that it could not return a verdict on only some of the counts, but must agree on all counts or the entire case would be presented to another jury. Petitioner contended that such an instruction improperly coerced the jury into returning a verdict.

In addressing the claim, the court of appeals found as follows:

Defendant next argues that the trial court committed error requiring reversal when it responded to one of the jury's questions. The jury, after deliberating for only two hours, asked the court what would happen if it could not reach a verdict on Count I. The trial court instructed the jury that it had to reach a verdict on both counts or the entire case would be submitted to another jury at another time. The trial court also gave the jury several options with regard to continuing their deliberations. Defendant claims that the trial court's statement with regard to the failure to reach a verdict on both counts was erroneous and that the instructions on deliberation were coercive and forced the jury to reach a verdict.

- 24 -

Defendant's arguments are not subject to review because they were waived by defense counsel. *People v. Carter*, 462 Mich 206, 214-19; 612 NW2d 144 (2000). In *Carter*, the court indicated that where counsel expressly waives an error, which does not involve a basic right, there is no "error" that can be reviewed. *Id.* In this case, after the trial court gave the challenged instruction, both counsel for the defense and the prosecution affirmatively indicated that they had no objection to it. The instruction did not pertain to a basic or controlling issue in the case and did not cover any issue that would require the "fully informed and publicly acknowledged consent" of defendant in order for effective waiver. Trial counsels' decisions with regard to certain jury instructions are often matters of trial strategy. See *People v. Rice (On Remand)*, 235 Mich App 429, 444; 597 NW2d 843 (1999); *People v. Coddington*, 188 Mich App 584, 608; 470 NW2d 478 (1991). The decision to expressly approve of the trial court's erroneous statement to the jury could have been a matter of trial strategy. Defense counsel may have believed that it was strategically better to have both counts decided together. Moreover, there was no reason to object to the instruction regarding deliberation that was given to the jury. A supplemental instruction to a deadlocked jury is not improper if it has no coercive effect. *People v. Daniels*, 142 Mich App 96, 97; 368 NW2d 904 (1985). Coercive effect is found where the court requires or threatens to require the jury to deliberate for an unreasonable length of time of for unreasonable intervals, or where the jurors are threatened to give up their honest convictions and agree with the majority. *Id.* at 97-98 (citation omitted). In this case, the jury instruction was explicitly noncoercive. Because the issues with regard to the supplemental instructions were issues capable of being waived by counsel and because they were in fact waived, there is no error for this Court to review.

(MCOA op. at 6.)

As I previously discussed, where a petitioner has failed to raise a contemporaneous objection to a jury instruction, and where the court of appeals expressly relied on the lack of objection in denying relief, the petitioner's claim is procedurally defaulted. *See Ylst*, 501 U.S. at 801; *Hicks*, 377 F.3d at 551-52; *see also Osborne*, 495 U.S. at 123 (discussing procedural default of claim based on failure to raise contemporaneous objection). When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation or can show actual innocence. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991);

*Murray*, 477 U.S. at 485; *Rust v. Zent*, 17 F.3d 155, 160-61 (6th Cir. 1994). To show cause sufficient to excuse a failure to raise claims on direct appeal, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

To excuse his default, Petitioner asserts the ineffective assistance of counsel in failing to object. Deficient performance of counsel may serve as cause for a procedural default when it rises to the level of ineffective assistance of counsel under the test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Murray*, 144 U.S. at 488; *Rust*, 17 F.3d at 161. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Strickland*, 466 U.S. at 687. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*, at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions are difficult to attack). A court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The Michigan Court of Appeals expressly concluded that counsel's performance did not amount to the ineffective assistance of counsel. The court reasoned that counsel's decision not to object most likely was a matter of trial strategy. Specifically, the court observed that counsel reasonably could have considered that it strategically was better to have both counts decided in the same proceeding. (MCOA op. at 6.) Moreover, the court concluded that no reason existed to object to the jury instruction because the supplemental instruction was not coercive.

A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003). The determination by the Michigan Court of Appeals unquestionably constituted a reasonable application of Supreme Court law to the facts of the case. *See* 28 U.S.C. § 2254(d)(1). Moreover, the state court's determination that the failure to object to the instruction constituted a strategic decision was supported by the facts before the court and is presumed to be correct. *See* 28 U.S.C. § 2254(d)(2). Petitioner has failed to make the necessary showing that would outweigh the presumption of correctness. Petitioner therefore cannot show cause for his procedural default.

Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup v. Delo*, 513 U.S. 298, 322 (1995) (citing *Murray*, 477 U.S. at 495). This requires a showing that in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."

- 27 -

*Coleman*, 244 F.3d at 540 (citing *Schlup*, 513 U.S. at 329).  Petitioner has made no attempt to assert his actual innocence.  Indeed, at trial, Petitioner admitted his conduct, arguing only that the conduct should be excused because he was proceeding under duress.  Accordingly, I conclude that Petitioner's fourth ground for habeas relief is procedurally defaulted.

### D. Ground VII: Reasonable doubt instruction

In his seventh ground for habeas relief, Petitioner contends that he was deprived of his right to due process by the court's jury instruction on reasonable doubt.  It is well settled that jury instructions that relieve the prosecution of proving beyond a reasonable doubt every fact necessary to each element of the offense charged violate a defendant's due process rights and therefore constitute constitutional error.  *See Sandstrom v. Montana*, 442 U.S. 510, 520-21 (1979) (relying on *In re Winship*, 397 U.S. 358, 364 (1970)).  However, on only one occasion has the Supreme Court rejected as inadequate an instruction on reasonable doubt.  *See Cage v. Louisiana*, 498 U.S. 39 (1990) (holding that trial court's reference to "substantial" and "grave" doubts and to "moral certainty" imposed a higher degree of doubt than that required by the constitution's requirement of reasonable doubt.)  Subsequently, in *Victor v. Nebraska*, 511 U.S. 1, 5 (1994), the Court specifically has considered whether a trial court is required or permitted to further define the concept of reasonable doubt:

> The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course . . . [S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt . . . the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof.

- 28 -

*Id.  See also Coleman v. Mitchell*, 268 F.3d 417, 437 (6th Cir. 2001).  Under *Victor*, trial courts have discretion to provide additional instructions regarding the meaning of the reasonable-doubt standard.

In rejecting Petitioner's claim, the Michigan Court of Appeals held as follows:

Where an instruction adequately conveys the concept of reasonable doubt, the instruction is proper.  *People v. Kuchar*, 225 Mich App 74, 78; 569 NW2d 920 (1997).

To pass scrutiny, a reasonable doubt instruction, when read in its entirety, must leave no doubt in the mind of the reviewing court that the jury understood the burden that was placed upon the prosecutor and what constituted reasonable doubt.  [*People v. Hubbard (After Remand)*, 217 Mich App 459, 487; 552 NW2d 493 (1996).]

The instruction must convey that reasonable doubt is "an honest belief based on reason."  *Id.*

In this case, contrary to defendant's argument, the trial court did not simply equate reasonable doubt with "firm conviction" or "real possibility."  Rather, the court instructed that guilt had to be demonstrated beyond a reasonable doubt and that it was not sufficient to establish a possibility or probability of guilt.  Rather, the jury had to be "firmly convinced" of guilt based on the evidence and conclusions drawn from it.  In addition, the trial court warned that reasonable doubt did not mean beyond all possible doubt or with absolute certainty.  The instruction at issue adequately conveyed the concept of reasonable doubt, i.e. that there had to be an honest doubt (firm conviction) based on reason (the evidence and conclusions drawn from it).  Because the instruction, when read as a whole, adequately conveyed the concept of reasonable doubt, we find no plain error requiring reversal.

(MCOA op. at 8.)

The decision by the court of appeals is eminently reasonable.  The trial court gave extensive instructions on reasonable doubt.  First, prior to the opening of the proofs, the trial court gave preliminary instructions in which it thoroughly discussed the obligation of the prosecution to prove guilt beyond a reasonable doubt.  The court stated that "it's absolutely essential that no defendant ever be convicted on proof which is less convincing than beyond a reasonable doubt.

(Tr. I, 83.)  The court continued by comparing the proof required in a civil action to that required in a criminal case, stating that "the possibility that the defendant is guilty, even the probability that he or she is guilty, is not enough.  Guilt has to be proven beyond a reasonable doubt.  Guilt is proven beyond a reasonable doubt if, after looking at all the evidence, and whatever inferences follow from it, you're firmly convinced that the defendant is guilty."  (Tr. I, 84-85.)  The court continued by advising the jury that a reasonable doubt is one based on the evidence.  (Tr. I, 84.)

At the close of the case, the court renewed its reasonable doubt instructions, reminding the jury that Petitioner was presumed innocent and that the presumption could only be overcome by proof of his guilt beyond a reasonable doubt.  (Tr. III, 158-59.)  The court reemphasized that it would be "terribly inappropriate to ever convict a defendant of any criminal offense on proof that was less than beyond a reasonable doubt."  (Tr. III, 159-60.)  The court also reminded the jury that it must not require the prosecutor to prove guilt by a standard higher than reasonable doubt, such as proof to absolute certainty.  (Tr. III, 160.)  The court instructed:

> As I said, what you are to do is take all this evidence, draw whatever conclusions follow from that evidence and determine whether you're firmly convinced that Mr. Robinson is guilty.  If you are, then you may find him such.  If, on the other hand, looking at the evidence and the lack of evidence, and what conclusions follow, you think there is a real possibility, not a mere possibility, that he is not guilty of a criminal offense, then, of course, he's entitled to the benefit of that doubt and you have to find him not guilty.

(Tr. III, 160-61.)  The court reiterated the requirement of proof beyond a reasonable doubt prior to its instructions on the elements of the possession offenses.  (Tr. III, 161.)

In light of these extensive instructions on reasonable doubt, the court of appeals' determination that the instructions, read as a whole, adequately conveyed the concept of reasonable

- 30 -

doubt was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.  Accordingly, Petitioner is not entitled to relief on his seventh habeas ground.

### E.      Ground X: Instruction on aiding and abetting

In his tenth ground for relief, Petitioner asserts that he was denied due process by the trial court's instruction on aiding and abetting for two reasons.  First, he suggests that the instruction provided an inadequate definition of the legal concept of aiding and abetting.  Second, Petitioner argues that the prosecutor effectively disclaimed the theory of aiding and abetting by trying the case on the theory that Petitioner was the principal.

The Michigan Court of Appeals thoroughly addressed Petitioner's claims.  First, the court noted that an instruction on aiding and abetting was warranted if sufficient evidence was presented from which a rational trier of fact could find Petitioner guilty as an aider and abettor. (MCOA op. at 9 (citing *People v. Smielewski*, 596 N.W.2d 636 (Mich. Ct. App. 1999)).  The court noted that evidence supporting a finding that the defendant was involved in something less than direct participation in the wrongdoing could be introduced by either the prosecutor or the defendant. *See People v. Head*, 535 N.W.2d 563 (Mich. Ct. App. 1995).  As in *Head*, the court of appeals found that

> Defendant injected the issue of aiding and abetting when he tried to minimize his role with regard to the drugs and claimed that the drugs belonged to R.J.  Once Defendant injected the theory that he was not the principal, the prosecutor argued that aiding and abetting was an alternative theory under which to convict defendant.  Because there was evidence, if believed, that defendant's role may have been less than direct participation in the wrongdoing, the instruction on aiding and abetting was properly given.

(MCOA op. at 10 (citations omitted).)

As previously noted, in order to demonstrate that a jury instruction deprived him of due process, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson*, 431 U.S. at 155. *See also Estelle*, 502 U.S. at 75. The state court's conclusion was entirely reasonable. Petitioner expressly testified that he permitted R.J. to use his apartment for storage or processing of illegal drugs. Although Petitioner attempted to excuse his conduct by the improper application of the defense of duress, his own admissions warranted a jury instruction on aiding and abetting.

Moreover, as that state court stated, Petitioner fails to identify how the instruction on aiding and abetting was inadequate. He therefore has failed to demonstrate how the instruction so infected the trial as to deprive him of due process. *Estelle*, 502 U.S. at 75; *Sanders*, 221 F.3d at 860. Petitioner therefore is not entitled to relief on his tenth habeas ground.

II.      Grounds III & IX:  Sentence on Improper Offense

In both grounds three and nine of his petition, Petitioner asserts that he was denied due process when the trial court convicted and sentenced him for possession with intent to deliver more than 50 but less than 225 grams of cocaine, MICH. COMP. LAWS § 333.7401(2)(a)(iii), notwithstanding the fact that the jury found him guilty only of possessing more than 50 grams, MICH. COMP. LAWS § 333.7403(2)(a)(iii). Petitioner appears to argue that, because the jury was not instructed as to the upper limit of the offense, but only as to the lower limit, he was convicted of an offense which does not exist under Michigan law.

The Michigan Court of Appeals held as follows:

Defendant next argues that he was convicted of a nonexistent crime and that the trial court improperly sentenced him to a crime different than that for which he was convicted. These arguments are patently disingenuous. Defendant was charged

- 32 -

with possession of more than fifty but less than 225 grams of cocaine, MCL 333.7403(2)(a)(iii); MSA 14.15(7403)(2)(a)(iii). At trial, there was no dispute that the amount of cocaine at issue was approximately 180 grams. The verdict form, which was approved by defendant, stated three options: "Guilty of possession with intent to deliver more than 50 grams of cocaine;" "Guilty of possessing more than 50 grams of cocaine;" or "Not guilty." The jury chose "Guilty of possessing more than 50 grams of cocaine." The judgment of sentence clearly indicates that the trial court sentenced defendant pursuant to MCL 333.7403(2)(a)(iii); MSA 14.15(7403)(2)(a)(iii). Based on the record, there is no dispute that defendant was convicted and sentenced for possessing more than fifty but less than 225 grams of cocaine, MCL 333.7403(2)(a)(iii); MSA 14.15(7403)(2)(a)(iii). Defendant makes the entirely meritless argument that his conviction was invalid because "possession of more than 50 grams of cocaine" is a nonexistent crime. Defendant apparently relies on the fact that the trial court and parties frequently referred to the crime as "possessing more than 50 grams" instead of "possessing more than 50 *but less than 225* grams" and the fact that the jury convicted him of "possessing more than 50 grams of cocaine" as opposed to possessing more than 50 *but less than 225* grams of cocaine." Defendant's argument exalts form over substance.

In *People v. Rand*, 397 Mich 638, 641; 247 NW2d 508 (1976), modified 399 Mich 1040 (1977), the form of the verdict included an option for "assault to do great bodily harm less than the crime of murder." The words "with intent" were accidentally omitted. *Id.* The trial court sentenced defendant for "assault *with intent* to do great bodily harm less than the crime of murder." *Id.* at 642. On appeal, the Court found that there was no error requiring reversal because the verdict, as adduced by reference to the record, clearly convicted defendant of assault *with intent* to do great bodily harm less than the crime of murder. *Id.* at 643-645. "To find otherwise would, quite literally, exalt the form over the substance." *Id.* at 645. In reaching its conclusion, the Court ruled:

> Defendant, however, would preclude any interpretation of the jury's verdict which does not contain a reference to each element of the offense upon which conviction lies, despite the fact that examination of the four corners of the record may reveal beyond peradventure the jury's intention. We cannot agree. . . .

> . . . . The written form of the verdict should not be exalted over the substantive intent of the jury. We hold, therefore, that a jury verdict is not void for uncertainty if the jury's intent can be clearly deduced by reference to the pleadings, the court's charge, and the entire record. This standard of "clear deducibility" adequately protects the defendants's right to trial by jury while it avoids artificiality in the construction of the jury verdict. [Id. at 643.]

- 33 -

> In this case it can be deduced from the record that defendant was convicted of a crime that does exist and that he was sentenced for the crime of which he was convicted, that being MCL 333.7403(2)(a)(iii); MSA 14.15(7403)(2)(a)(iii).

(MCOA op. at 4-5.)

Petitioner has cited no Supreme Court precedent requiring a higher standard than that applied by the Michigan Court of Appeals. He therefore has failed to demonstrate that the state court's determination was either contrary to or an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d). Further, he has failed to demonstrate that the state court's factual determination – i.e., that the judgment of sentence clearly indicates that the trial court sentenced Petitioner in accordance with MICH. COMP. LAWS § 333.7403(2)(a)(iii) – is unreasonable. Because such factual findings are presumed correct, 28 U.S.C. § 2254(e)(i), Petitioner is not entitled to habeas relief on grounds three and nine.

### III.    Ground V:  Reference to Petitioner's Silence

In ground five of his petition, Petitioner asserts that he was denied his Fifth Amendment right to remain silent by the prosecutor's elicitation of testimony on cross-examination as to why Petitioner had not told police about R.J.'s threats until the date of trial. The Fifth Amendment by its terms prevents a person from being "compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. The amendment "prevents the prosecution from commenting on the silence of a defendant who asserts the right." *Jenkins v. Anderson*, 447 U.S. 231, 235 (1980) (citing *Griffin v. California*, 380 U.S. 609, 614 (1965). However, the Supreme Court repeatedly has held that not all references to a defendant's exercise of the right to remain silent are proscribed. *See Jenkins*, 447 U.S. at 235-38 (citing cases); *see also Portunondo v. Agard*, 529 U.S. 61, 69-70 (2000). In *Jenkins*, the Court specifically held that a prosecutor could, during cross-

- 34 -

examination and again during closing, properly comment on a testifying defendant's failure to report his version of the event to the police for two weeks. *Jenkins*, 447 U.S. at 240. The Court concluded that, once a defendant takes the stand, he is "'subject to cross-examination impeaching his credibility just like any other witness.'" *Id.* at 235-236 (quoting *Grunewald v. United States*, 353 U.S. 391, 420 (1957)).

The Michigan Court of Appeals addressed Petitioner's claim as follows:

Defendant next argues that the prosecutor improperly elicited testimony from defendant that he exercised his right to remain silent. We disagree, A prosecutor may use a defendant's silence to impeach a claim that defendant was not given an opportunity to explain his exculpatory version of events to the police. *People v. Crump*, 216 Mich App 210, 214-215; 549 NW2d 36 (1996); *People v. Allen*, 201 Mich App 98, 103; 505 NW2d 869 (1993).

In this case, on direct examination, defendant indicated that he did not tell his story to the police because he did not think they would believe him and that he probably would have been locked up, would not have had a way to defend himself properly, and would not have had a chance to have a jury hear his story. Defendant also testified, however, that he eventually hired a lawyer and turned himself in to the police station. There was no testimony that he told his side of the story to the police after he turned himself in with the assistance of counsel. On cross-examination, the prosecutor attempted to elicit that defendant did not tell his story until he took the witness stand at trial. Defendant gave a nonresponsive answer to the prosecutor's question and indicated that he never told the police his story because the police "never asked." Following a bench conference, the prosecution asked defendant if the police failed to question him because he had exercised his right to remain silent. Defendant answered affirmatively. Under the circumstances, where defendant inferred [sic] that he did not tell his story to police because he would have been treated unfairly and where defendant indicated that he was never asked to tell his story, the prosecution was entitled to know that defendant was given an opportunity to tell his side of the story and refused to do so. *Crump*, *supra*. The prosecution did not use defendant's silence to rebut a claim of innocence, but to rebut the inference that defendant did not have an opportunity to present his exculpatory story before trial.

(MCOA op at 6-7.)

- 35 -

The decision of the Michigan Court of Appeals was fully consistent with existing Supreme Court case law. Once Petitioner elected to testify and indicated that the police did not ask him to tell his story, the prosecutor was fully entitled to question him about and comment on his silence in order to challenge his credibility. *Jenkins*, 447 U.S. at 240. The court of appeals' determination therefore was neither contrary to nor an unreasonable application of established Supreme Court precedent. I recommend that Petitioner's fifth ground for habeas relief be denied.

IV.     Ground VI: Search Warrant

Petitioner contends that he was denied his Fourth and Fourteenth Amendment rights to due process when the fruits of a search warrant were admitted into evidence, despite the fact that the warrant was not supported by probable cause. In addition, Petitioner contends that counsel was ineffective in failing to file a motion challenging the search warrant and the fruits of the search.

Petitioner's challenge to the validity of the search is barred under the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone*, the Supreme Court held that federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure, as long as the state has given the petitioner a full and fair opportunity to litigate the Fourth Amendment claim. *Id.* at 494-95; *see also Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir. 2000); *McQueen v. Scroggy*, 99 F.3d 1302, 1332 (6th Cir. 1996).

In order for the rule of *Stone v. Powell* to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim, and the presentation of the claim in the present case must not have been frustrated by failure of that mechanism. *See Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir. 1985). If these two inquiries are satisfied, federal habeas review of the Fourth Amendment claim is precluded, even if the federal court deems the state-court

- 36 -

determination of the claim to have been in error.  *Id.* at 824; *accord Jennings v. Rees*, 800 F.2d 72 (6th Cir. 1986).

In the present case, it is clear beyond doubt that Petitioner cannot satisfy either prong of the Sixth Circuit standard.  First, it is undisputed that Michigan has a state procedural mechanism which, in the abstract, presents a full opportunity to raise a Fourth Amendment claim before trial. Even before the United States Supreme Court decided that the federal exclusionary rule applied to state criminal proceedings, the Michigan courts applied the exclusionary rule to the fruits of unconstitutional searches and seizures.  *See People v. Margelis*, 186 N.W. 488 (Mich. 1922).  After *Mapp v. Ohio*, 367 U.S. 643 (1961), the Michigan courts have consistently acknowledged their duty, under both the federal and state constitutions, to suppress evidence seized in violation of the Fourth Amendment.  *See*, *e.g.*, *People v. David*, 326 N.W.2d 485, 488 (Mich. App. 1982).  Consequently, Michigan affords criminal defendants a vehicle by which to raise Fourth Amendment challenges.

Second, Petitioner has not alleged any grounds to support the conclusion that presentation of his Fourth Amendment claim was somehow frustrated due to a failure of the state's mechanism.  To satisfy the second prong of *Stone v. Powell*, petitioner must allege facts showing that the state corrective mechanism has somehow broken down.  *See*, *e.g.*, *Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987) (habeas review not barred when state appellate court completely ignored Fourth Amendment claim).  Petitioner has not alleged any facts showing that the state's mechanism has broken down.  Rather, it is clear that the Michigan courts gave petitioner's Fourth Amendment claim full and proper consideration.  Petitioner failed to challenge the search warrant at trial.  The Michigan Court of Appeals therefore held that the challenge to the validity of the search warrant was waived.  Notwithstanding the failure to object, however, the court of appeals reviewed the record

for plain error. The court rejected as completely unsupported Petitioner's contention that the officers were not entitled to rely on the drug evidence in plain view in seeking a search warrant. The court expressly found that the search revealing the drugs and money was not conducted until the search warrant was obtained. Moreover, the court concluded that no grounds existed for challenging the warrant. It therefore rejected Petitioner's claim of ineffective assistance of counsel on the basis of counsel's failure to file a motion to suppress. (MCOA op. at 7-8.) Petitioner applied for leave to appeal to the Michigan Supreme Court, which denied his application.

Because it is clear that Petitioner's ability to challenge the search warrant was not frustrated by a failure of the state process, even if this Court were somehow to disagree with the determination of the Michigan courts, that disagreement would be insufficient to satisfy the second prong of the Sixth Circuit standard. The Sixth Circuit has pointedly held that the doctrine of *Stone v. Powell* applies, even if the federal court deems the state-court determination of the Fourth Amendment claim to have been in "egregious error." *Gilbert v. Parke*, 763 F.2d at 824 (citing *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982)). This is plainly sufficient to bar habeas review of Petitioner's claim under the doctrine of *Stone v. Powell*. Accordingly, his claim of illegal search and seizure is precluded.

In *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986), the Supreme Court held, as an exception to *Stone*, 428 U.S. 465, that a claim of ineffective assistance of counsel can permissibly include a claim that trial counsel failed to litigate competently an issue under the Fourth Amendment. To obtain habeas relief, the Supreme Court stated that "[t]he [petitioner] must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict

- 38 -

would have been different absent the excludable evidence in order to demonstrate actual prejudice" under *Strickland's* second prong.  477 U.S. at 375.

Petitioner has failed to demonstrate that counsel was ineffective for failing to challenge the search warrant.  As previously noted, to establish a claim of ineffective assistance of counsel, Petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *Strickland*, 466 U.S. at 687.  In reviewing such a claim, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  On habeas review, in order for a petitioner to succeed on his claim of ineffective assistance of counsel, Petitioner must show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner.  *Bell*, 535 U.S. at 698-99.

The court of appeals expressly concluded that Petitioner had failed to demonstrate that counsel was ineffective in failing to file a motion to suppress.  The state court held that, "[b]ecause the record does not support a conclusion that a motion to suppress was warranted, defendant's argument that his counsel was ineffective for not moving to suppress has no merit."  The state court's conclusion was patently reasonable.  Petitioner has failed to identify any grounds on which the search warrant could or should have been challenged.  Counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Chegwidden v. Kapture*, No. 03-1527, 2004 WL 551471, at *2 (6th Cir. March 18, 2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); Koch v. Puckett, 907 F.2d 524, 527 (5th Cir.1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978).

Accordingly, the decision of the Michigan Court of Appeals constituted a reasonable application of established Supreme Court precedent.  28 U.S.C. § 2254(d).  Petitioner therefore is not entitled to relief on his sixth habeas ground.

V.      Ground VIII:  Fingerprint evidence

Petitioner contends that he was deprived of his Fourteenth Amendment right to due process by the admission of evidence that his fingerprint appeared on the plate containing cocaine residue.  Specifically, he contends that, because the witness could not testify that the fingerprint was made after the cocaine residue was on the plate, the fingerprint should not have been admitted into evidence.

As the Supreme Court explained in *Estelle*, 502 U.S. at 67-68, the question whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.*  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.  State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman*, 268 F.3d at 439; *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that

- 40 -

the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders*, 221 F.3d at 860. Petitioner has not met this difficult standard.

As the Michigan Court of Appeals held, no question exists that the evidence was both relevant and not unfairly prejudicial. (MCOA op. at 8-9.) The presence of the fingerprint, while not dispositive of the issue, was entirely relevant to prove Petitioner's possession of the cocaine. While other inferences were possible, Petitioner was entirely free to cross-examine witnesses and to argue in closing that the fingerprint could have been made before cocaine was placed on the plate. "Arguments regarding the weight of the evidence do not effect [sic] admissibility but are properly made to the trier of fact." (MCOA op. at 9.) Admission of the evidence did not implicate Petitioner's fundamental rights affecting due process. I therefore recommend that Petitioner's eighth ground of habeas relief be denied.

## VI. Grounds XI & XIV: Ineffective Assistance of Counsel

In his eleventh ground for habeas relief, Petitioner raises the final claim he presented on direct appeal. In that claim, he challenged the effectiveness of counsel in failing to object to the alleged trial improprieties he challenged in grounds one through five and seven through ten. In addition, in his twelfth through fourteenth grounds for relief, Petitioner challenges the effectiveness of trial counsel in three remaining, though partially related, areas: (1) counsel failed to call key witnesses to testify about the visibility of the cocaine prior to the execution of the search warrant; (2) counsel failed to present evidence showing that Petitioner was not the only resident of the apartment; and (3) counsel failed to investigate leads that would prove the invalidity of the search.

- 41 -

To establish a claim of ineffective assistance of counsel, Petitioner must prove both that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Strickland*, 466 U.S. at 687. When reviewing such a claim, the Court presumes that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689. Further, to succeed on his claim of ineffective assistance of counsel on habeas review, Petitioner must show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Bell*, 535 U.S. at 698-99.

The Court previously has addressed all of the first ten claims Petitioner raised on direct appeal, for nine of which Petitioner now renews his contention that trial counsel was ineffective in failing to object. The Court addressed most of those nine claims on the merits (Grounds I, II, III, V, VII, VIII, IX, X), notwithstanding any failure by counsel to object at trial. In the remaining claim (Ground IV), the Court considered whether ineffective assistance of counsel could excuse the failure to object. As a result, all of Petitioner's claims of ineffective assistance of counsel related to his direct appeal already previously have been determined to be meritless. With respect to those claims the Court previously considered and rejected on the merits, Petitioner cannot demonstrate the prejudice necessary to support his ineffective assistance of counsel claim because he cannot demonstrate reversible error. *See Strickland*, 466 U.S. at 687. With respect to the claim considered procedurally defaulted, the Court previously has determined that counsel's performance was not constitutionally deficient. *Id.*

- 42 -

Moreover, the Michigan Court of Appeals, having previously addressed the effectiveness of counsel on several of Petitioner's claims, squarely rejected his claim of ineffective assistance as to all of the errors alleged on appeal.  The court held that

> defendant has not demonstrated that his counsel's performance was objectively unreasonable with regard to any of the alleged errors argued on appeal.  Moreover, defendant has not demonstrated that the outcome of the proceedings would have been different if counsel had objected to any of the instructions, moved to suppress evidence, or acted with regard to any of the other claimed errors, none of which had merit.  Thus defendant has not met his burden of demonstrating that he did not receive the effective assistance of counsel.

(MCOA op. at 10-11.)  The court's application of *Strickland* was patently reasonable.  Accordingly, Petitioner has failed to demonstrate entitlement to relief on this claim with respect to the issues raised in his direct appeal.

The remaining three claims of ineffective assistance of counsel were raised for the first time in Petitioner's motion for relief from judgment, filed in the trial court on January 24, 2002.  The trial court denied relief on the grounds of MICH. CT. R. 6.508(D)(2) and (3), concluding that Petitioner's ineffective assistance of counsel claims either were raised or should have been raised in his direct appeal.  (1/31/02 Tr. ct. ord., docket # 18 & docket #9 Ex. A.)  Petitioner sought leave to appeal to both the Michigan Court of Appeals and the Michigan Supreme Court, both of which also denied relief pursuant to MICH. CT. R. 6.508(D).

As I previously have noted, when Petitioner has committed a state-law default that prevented further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst*, 501 U.S. at 801. In cases where the Michigan Court of Appeals and Michigan Supreme Court deny leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," it

- 43 -

is sufficiently clear that the supreme court intended to invoke a procedural bar. *See Munson v. Kapture*, 384 F.3d 310, 314-15 (6th Cir. 2004); *Abela v. Martin*, 380 F.3d 915, 923 (6th Cir. 2004); *see also Hargrave-Thomas v. Yukins*, 374 F.3d 383, 388 (6th Cir. 2004); *Burroughs v. Makowski*, 282 F.3d 410 (6th Cir. 2002); *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000). In order to obtain federal review of his procedurally defaulted claim, Petitioner must demonstrate either cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or that the absence of federal habeas review "will result in a fundamental miscarriage of justice," *Hicks*, 377 F.3d at 551-52, by allowing the punishment of one who was actually innocent, *Murray*, 477 U.S. at 495.

Petitioner makes no attempt to demonstrate cause for his procedural default. As the state trial court noted in denying the motion, Petitioner did not argue the ineffective assistance of appellate counsel nor did he allege any other cause for having failed to raise the claim on direct appeal. (1/31/02 Tr. ct. ord., docket # 18 & docket #9 Ex. A.) Moreover, as the state court recognized, constitutionally ineffective assistance of counsel can constitute cause for procedural default. *Munson*, 384 F.3d at 316; *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir.1994). However, for Petitioner to use the claim of ineffective assistance of appellate counsel as "cause," he must first meet the "cause" and "prejudice" standard for the claim of ineffective assistance of appellate counsel itself. *See Edwards*, 529 U.S. at 453; *Coleman*, 244 F.3d at 538; *Lancaster*, 324 F.3d at 436-37; *Clifford v.Chandler*, No. 01-5926, slip op. at 6 (6th Cir. June 25, 2003). Plaintiff, however, has failed to do so.

As a consequence, Petitioner has failed to demonstrate cause excusing his default under MICH. CT. R. 6.508(D). Where a petitioner fails to show cause, the court need not consider

whether he has established prejudice. *See Engle*, 456 U.S. at 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985). Petitioner also has not demonstrated that manifest injustice would result because he has not made a colorable claim of innocence; he has not even alleged that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup*, 513 U.S. at 322; *Coleman*, 244 F.3d at 540 ("actual innocence" requires Petitioner to show that in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt).

I therefore conclude that Petitioner's grounds twelve through fourteen for habeas relief are procedurally defaulted. As earlier stated, Petitioner's eleventh ground is meritless.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Dated:    April 25, 2005              /s/  Hugh W. Brenneman, Jr.
                                      Hugh W. Brenneman, Jr.
                                      U.S. Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).